## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF RHODE ISLAND

In re:

PEDRO ANTONIO PICHARDO
LILIAN SUYAPA ORTIZ

             Debtors

Chapter   13
Case No.  12-13015

## DECISION AND ORDER

      The Court held an evidentiary hearing on March 14, 2013, to determine the value of the Debtors' real estate, a three-unit multi-family residence located at 177-179 Linwood Avenue, Providence, Rhode Island, where the Debtors reside (hereafter the "Residence"). The hearing was held in the context of the confirmation of the Debtors' Chapter 13 plan and Bank of America, N.A.'s objection to the plan. This is the first valuation hearing I have held in which one of the parties, here the Debtors, relies upon a broker's opinion of value in opposition to the valuation of the Residence by a licensed appraiser on behalf of the Bank. Ordinarily, I issue bench decisions after such hearings. However, I am cognizant of the interest of the insolvency bar regarding my views on the practice before my predecessor, Judge Votolato, in which one party in a contested valuation issue, most often a debtor, offers a broker's opinion of value in evidence against the other party, usually a secured creditor, who submits as evidence an appraisal performed by a licensed appraiser. Consequently, I felt it would be helpful to share my view on this practice by issuing a written decision in this matter. For the benefit of the parties in the matter, I previously rendered my findings at the conclusion of the hearing.

**Background**

The parties stipulated in their Joint Pre-Trial Order that the Bank is the current holder of a first mortgage against the Residence, securing an outstanding debt in the amount of $258,123.04 as of September 17, 2012. The parties agree that the Debtors, collectively as tenants by the entirety, hold a 50% interest in the Residence, and their non-debtor son holds the remaining 50% interest. The Chapter 13 plan includes a Motion to Modify the Secured Claim of the Bank, whereby the Debtors seek to cram down the Bank's interest by reducing the principal balance of the mortgage to $100,000, payable at a modified interest rate of 4.25% over the five-year term of the plan. The original contract interest rate payable under the mortgage and related promissory note is 5%. The Bank contends that the Residence has a fair market value of $146,000 and that it is entitled to be paid interest over the term of the plan at the rate of 5.25% pursuant to *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). This interest rate is based upon a prime rate of 3.25% as stipulated by the parties plus an additional 2% the Bank asserts is appropriate for the risk factor under the plan. Both valuation opinions upon which the parties rely adopted the Sales Comparison Approach as the most reliable valuation method for this type of real estate.

To fully understand my view on the practice of using broker's opinions as evidence to counter an appraiser's opinion based on a written appraisal, it is important that I describe the materially different level of information provided by the two types of valuations.

**Debtor's Broker's Opinion of Value**

To support their plan the Debtors submitted into evidence a one-page letter, prepared by real estate broker Peter H. Hurly of Peter H. Hurley Real Estate, dated August 22, 2012, stating his opinion of the fair market value of the Residence as $100,000. Mr. Hurley, a real estate broker licensed in the State of Rhode Island since 1965, testified at the hearing on behalf of the

2

Debtors. The letter states that Mr. Hurley "personally inspected" the Residence. It describes the "Fair Market Value" of the property as "the most probable price in terms of money requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus." He bases his opinion "on a study of comparable properties that have recently sold." Accompanying Mr. Hurley's letter are copies of several pages from the Multiple Listing Service ("MLS") for five properties offered as sales comparisons to the Residence, all indicating a print date of February 4, 2013. No description of the Residence was provided in the letter. The information on the MLS printouts is fairly limited and the comparison sales Mr. Hurly relied upon, all located in the West End neighborhood of Providence near the Residence, are summarized as follows.

Comparable Sale #1. 515-517 Cranston St., Providence; sale price of $41,000, but no date of sale provided. The property is noted to be "REO/Bank owned," which both Mr. Hurley and the Bank's appraiser agreed refers to property that is owned by a mortgage holder usually as a result of a foreclosure sale. The main features of the property noted are: built in 1925; lot size of 4,447 SF[1]; gross living area of 3,945 SF; 3 units, each with a total of 6 rooms, including 3 bedrooms and 1 bath.

Comparable Sale #2. 58 Vineyard St., Providence; sale price of $85,000, but no date of sale provided. The property is noted to be "REO/Bank owned," to be sold in an "as is" condition. The main features of the property noted are: built in 1900; lot size of 3,980 SF; gross living area of 3,591 SF; 3 units: two units with 6 rooms, including 3 bedrooms and 1 bath; and one unit with 5 rooms, including 3 bedrooms and 1 bath.

Comparable Sale #3. 24 Linwood Ave., Providence; sale price of $57,500, but no date of sale provided. The sale is noted to be a "short sale," which the parties agree refers to a sale in an

---

[1] Throughout this Decision I will refer to measurements of square footage as "SF".

amount less than the outstanding mortgage debt against the property with the mortgagee being the primary interested party on the seller side of the transaction. The main features of the property noted are: built in 1920; lot size of 6,969 SF; gross living area of 3,656 SF; 2 units, each with a total of 4 rooms, including 2 bedrooms and 1 bath.

<u>Comparable Sale #4</u>. 21 Linwood Ave., Providence; sale price of $46,000 but no date of sale provided. The property is noted to be "REO/Bank owned." The sale terms are also described as requiring the "[b]uyer responsible for smoke certificates, utility activation and final water . . . and to be sold in an "as is" condition." The main features of the property noted are: built in 1900; lot size of 9,135 SF; gross living area of 1,568 SF; 2 units: one with 4 rooms, including 2 bedrooms and 1 bath; and one with 3 rooms, including 1 bedroom and 1 bath.

<u>Comparable Sale #5</u>. 196 Linwood Ave., Providence; sale price of $30,000 but no date of sale provided. The property is noted to be "REO/Bank owned." The property is described as "in need of interior renovations." The main features of the property noted are: built in 1900; lot size of 6,098 SF; gross living area of 2,980 SF; 3 units, each with 5 rooms, including 2 bedrooms and 1 bath.

### The Bank's Appraisal

In support of its asserted fair market value of $146,000 for the Residence, the Bank submitted into evidence the interior appraisal dated December 4, 2012, performed by Andrew Pappas, a real estate appraiser licensed by the Commonwealth of Massachusetts and the State of Rhode Island since 2001. Mr. Pappas, who owns his own appraisal firm, testified at the hearing on behalf of the Bank.

### A. Residence Description

The Appraisal contains a comprehensive description of the Residence and the surrounding neighborhood in which it is located, as well as market factors impacting the sale value of homes in the area. Mr. Pappas described the neighborhood as urban and built up, consisting primarily of multi-family homes of "various styles and ages maintained in overall average condition." He also points out the easy accessibility of the Residence to major state routes 10 and 6 and interstate route 95. Mr. Pappas indicated that sales concessions are "not uncommon" in the area of 3% to 5%. He also took into account that REO and short sales are dominant in the area and this directly influences the sales values and sale listings for properties in the neighborhood. He conceded at the hearing that there are several properties in the area, including on the street on which the Residence is located, that are boarded up or vacant and in poor condition, resulting in below-market value sales for these particular properties. In his Appraisal as well as his testimony, Mr. Pappas explained that "data from foreclosed properties is not a good indicator of market conditions relative to properties sold under conventional terms." His valuation not only considered such adverse factors, but also accounted for conventional sales that have occurred in the last year in the neighborhood on nearby streets "around the corner from or parallel" to the Residence. The Appraisal identified 32 comparable sales in the neighborhood within the last year ranging in sale prices from $25,000 to $250,000.

Regarding the Residence itself, the Appraisal depicts it as 155 years old in average condition. Its features are summarized as: 3 units, each with 5 rooms, including 2 bedrooms and 1 bath; gross building area of 5,310 SF; lot size of 14,601 SF, 2 finished rooms in the basement, and a two-car garage. Both Mr. Pappas and Mr. Hurley agreed that the Residence is a unique

property for the neighborhood because of its substantially greater living area and lot size as compared to the other surrounding properties and because of its elegant design.

### B.  Comparable Sales and Adjustments

Mr. Pappas emphasized during his testimony that the Residence is a "unique and complex property" for the neighborhood. Consequently, a number of the sales comparable required net upward adjustments exceeding 15%. However, Mr. Pappas clarified that because of his knowledge of the surrounding area, it was his opinion the sales he used were "indeed comparable and reflect market reaction as compared to the [Residence]." Pursuant to standard industry practices and guidelines, applicable adjustments were made to sales prices of these comparable properties to account for differences in gross living area, which Mr. Pappas adjusted at $10.00 SF; condition of the property; absence of a garage, adjusted at $5,000 for no garage; and $3,000 for an unfinished basement. The following is a summary of the sales comparisons set forth in the Appraisal, all of which are in Providence's West End and within less than one-half mile of the Residence.

Comparable Sale #1. 654 Cranston St, Providence, located within .15 miles of the Residence; sale price of $118,000 on December 30, 2011. The Appraisal states that no adjustment was made for date of sale due to "relative stability of the market since that time." The main features of the property are noted as: age of 92 years; 3 units, each with 5 rooms, including 3 bedrooms and 1 bath; gross building area of 3,357 SF; lot size of 4,513; gross monthly rent of $2,275.  A net upward adjustment of $27,530 was applied to the sale price to derive an adjusted comparable fair market value of $145,530.

Comparable Sale #2.  19 Rosedale St, Providence, located within .30 miles of the Residence; sale price of $83,000 on September 24, 2012. The main features of the property are

noted as: age of 82 years; 3 units: 2 units with 7 rooms each, including 4 bedrooms and 1 bath; and 1 unit with 6 rooms, including 2 bedrooms and 1 bath; gross building area of 4,185 SF; lot size of 3,999 SF; gross monthly rent of $2,200. A net upward adjustment of $69,250, of which $50,000 was attributable to the more inferior condition of the property, was applied to the sale price to derive an adjusted fair market value of $152,250.

Comparable Sale # 3. 26 Hanover St., Providence, located within .25 miles of the Residence; sale price of $160,000 on June 11, 2012. The main features of the property are noted as: age of 80 years; 3 units, each with 4 rooms, including 2 bedrooms and 1 bath; gross building area of 2,907 SF; lot size 4,047 SF. A net upward adjustment of $27,030 was applied to the sale price to derive an adjusted fair market value of $187,030.

### Broker's Valuation Versus Appraiser's Valuation

I do not share the view that the opinion of value by a licensed real estate broker should be afforded the same evidentiary weight as that rendered by a licensed appraiser. At the outset, an assessment of the fair market value of a real estate parcel by an appraiser carries greater weight than that of a real estate broker who does not have the same rigorous, specialized training. While a broker relies upon his sales experience, a broker is not instructed in his or her valuation opinion by the industry standards and uniform guidelines to which a competent appraiser must adhere in preparing an appraisal and rendering an opinion of value. By the same token, I do not agree with those courts that categorically reject a broker's opinion of value and bar a real estate broker from testifying at a valuation hearing. *See Donaway v. Tucker (In re Donoway)*, 139 B.R. 156, 158 (Bankr. D. Md. 1992) ("Real estate brokers and agents without specialized training in real estate appraising are not qualified to testify as to their opinions regarding market value."). I believe that a real estate broker is qualified to provide an opinion of value based on personal experience, and

provided the opinion is credibly supported, I see no reason to entirely dismiss the testimony of a broker on valuation issues. *See In re Smith*, 267 B.R. 568, 575 (Bankr. S.D. Ohio 2001).

As an evidentiary matter, however, it comes down to the weight to assign to such testimony and opinion. *Id.* at 575 ("While [the broker] was permitted to testify as an expert witness, [the broker's] lack of appraisal training and limited experience as an appraiser clearly affect the weight accorded to his testimony."); *In re Robertson*, 135 B.R. 350, 353 (Bankr. E.D. Ark. 1992) ("The [broker's] lack of training and other qualifications in this area will, however, significantly affect the weight given his testimony."). A real estate broker is simply not on the same level playing field as a licensed appraiser, and absent material irregularities in the appraisal,[2] an appraiser's assessment of value should be afforded greater weight than that of a broker. To be clear, I am not concluding that based on the particular evidence and testimony submitted, a broker's opinion of value can never prevail over that of an appraiser or result in a determination by the Court of a value different from that posited by an appraiser. But a party who relies upon a real estate broker's opinion of fair market value to oppose a valuation by a licensed qualified appraiser faces another evidentiary hurdle that would otherwise not be present if the experts before the court were both qualified licensed appraisers.

## The Court's Findings and Conclusions

### 1. Valuation of the Residence

The matter before the Court is an example of the pitfalls of relying on a real estate broker's opinion of value and testimony when battling a valuation based upon an appraisal and the testimony of a qualified licensed appraiser.

---

[2] For example, an appraisal could potentially be discredited entirely if the valuation methodology utilized is one that does not meet the industry standards; or the sales comparable may be entirely inappropriate because they are significantly dissimilar to or located in a substantially different neighborhood from the appraised property; or the information contained in the appraisal is significantly inaccurate or unreasonably stale.

The greatest difficulty I had with Mr. Hurley's valuation is that the MLS printouts of his sales comparable provide minimal information, and Mr. Hurley testified only in broad strokes. No dates of the sales of the comparable properties utilized by Mr. Hurley were stated and unfortunately, Mr. Hurley was unable to supply such dates. He explained that there is a listing page for each of these properties that indicate the actual sale date, but for whatever reason these pages were not submitted into evidence. Mr Hurley could only surmise from the MLS listing numbers that these sales occurred sometime in 2011 or 2012. Without sale dates, the comparable sales upon which Mr. Hurley relied are entitled to little if any weight. Furthermore, the sales range in price from $30,000 to $85,000 and were all REO bank-owned properties or short sales. Two of the properties have only two units whereas the Debtors' Residence has three units. Some of these properties appear to be vacant and have boarded windows rendering them highly inferior to the Residence. In contrast, the sales comparable properties utilized by Mr. Pappas all have three units, were occupied, and generated rental income. The evidence before me submitted by the Bank details the reconciliation performed by Mr. Pappas for each of his sales comparable properties relative to the Residence. No such explanation was provided by Mr. Hurley of how he reconciled his sales comparable properties with such broad ranges of values and inferior conditions to the Residence.

Mr. Hurley simply emphasized that "location is everything," and the neighborhood has suffered substantially from the economic decline in the marketplace and the recession over the last four years. But Mr. Pappas took such factors into account in his appraisal of the Residence. I also find Mr. Hurley's process in selecting his comparable properties another basis for discrediting his opinion. He apparently limited his search of properties in the area, focusing primarily upon sales on the same street as the Residence, despite the fact that such properties

were materially different in quality and character from that of the Residence. For example, in his Appraisal Mr. Pappas states that he rejected use of a sale of 24 Linwood Ave. (used by Mr. Hurley) because in his opinion it "was much inferior" to the Residence and "would have warranted heavy adjustments." Thus he deemed it "unreliable." Moreover, the sales comparable properties chosen by Mr. Pappas included both REO bank-owned properties as well as a conventional sale property. In his professional opinion, relying upon only distressed sales such as REO sales and short sales when there have been conventional home sales in the neighborhood within the last year does not provide reliable data indicative of the fair market value of properties in the neighborhood. When asked if he considered any conventional sales as part of his analysis, Mr. Hurley stated he had not, and in fact he did not even consider sales in the area by the category of the sale. I find that such limited consideration of the sales within the neighborhood surrounding the Residence clearly skewed Mr. Hurley's valuation of the Residence, further undermining the credibility of his opinion.

In partial explanation for his lower value, Mr. Hurley noted that while unique and elegant in style, the Residence needed "lots of work." He gave no further elucidation. In stark contrast, Mr. Pappas testified that all mechanical and plumbing systems in the Residence appeared functional (subject to proper customary inspections), there were no holes in the walls or other notable defects, the kitchens in each of the units appeared to have been renovated approximately ten years ago, and the Residence did not show signs of significant deferred maintenance. If such issues existed, Mr. Pappas testified, he was obligated to describe such defects and required repairs on a separate page of his Appraisal and deduct the costs of correcting such items from the appraised value of the Residence. He only noted a $1,000 cost for minor repairs and cleaning, which he explained is a standard deduction.

Finally, no evidence was provided by Mr. Hurley concerning specific adjustments Mr. Pappas applied to his sales comparable properties that might render the adjusted comparable sale prices flawed. Indeed, no specific evidence was presented during the hearing by Mr. Hurley from which I could evaluate whether there should be some concrete adjustments applied to Mr. Pappas's ultimate opinion of the fair market value of the Residence. Mr. Hurley did take issue with two of the comparable properties included in the Appraisal listed for sale but not yet sold on the grounds that the listing prices were too high as reflected by the number of days they remained on the market. However, Mr. Hurley did not state the price at which he believed they should be listed or how they compared to the Residence. Moreover, Mr. Pappas testified that he reviewed his initial opinion of value with a supervisory appraiser of Landsafe Appraisals[3] and one of its regional appraisers. After review, which included a visit to the Residence and the neighborhood by at least one of these other appraisers, Mr. Pappas reduced his initial valuation figure by $15,000 to arrive at his final fair market valuation of $146,000.

At the conclusion of the hearing, based on the evidence before me, I found that Mr. Hurley's opinion of value lacked credibility. I adopted Mr. Pappas's valuation of $146,000, concluding that it reflected a reasonable assessment of the fair market value of the Residence.

### 2. Applicable Interest Rate

Having resolved the valuation issue, I must also determine the applicable interest rate to be paid to the Bank under the plan on its modified secured claim of $146,000. The parties have each agreed that the United States Supreme Court's decision in *Till* is the prevailing case on this issue. *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

In *Till*, a plurality of the Justices adopted the "prime-plus" approach when calculating an appropriate cramdown interest rate:

---

[3] Landsafe Appraisals is the appraisal company that engaged Mr. Pappas to conduct the appraisal for the Bank.

> [T]he approach begins by looking to the national prime rate . . . which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends  . . . on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. . . .
>
> . . .
>
> We do not decide the proper scale for the risk adjustment, as the issue is not before us. . . . [O]ther courts have generally approved adjustments of 1% to 3% . . . .

*Id*. at 479-80.

While debtors bear the burden of establishing the first element of the "prime-plus" formula, the prime rate of interest, the burden of proving the second element, the risk adjustment, falls to the creditor. *In re Cachu*, 321 B.R. 716, 720 (Bankr. E.D. Cal. 2005). Although the *Till* Court did not provide more specific risk factors other than "the circumstances of the estate, the nature of the security, and duration and feasibility of the reorganization plan," the Supreme Court added in a footnote that "if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cram down loans." *Till*, 541 U.S. at 478 n.18.  Some courts believe that "bankruptcy may actually benefit a secured creditor, 'the risks inherent in a chapter 13 case are less than the risks associated with non-bankruptcy cases because the court's approval of a chapter 13 plan presumes the debtor's ability to complete the plan. In addition, if the plan is successful, the cost of collection is eliminated.'" *In re Cachu*, 321 B.R. at 721.

Ultimately, the interest rate adjustment is subject to the variable factors presented in each particular case. For example, in *In re Plourde*, 402 B.R. 488, 493 (Bankr. D.N.H. 2009), the

12

court found that a "three percent premium is warranted for the following: liquidity of the market, the creditor's inherent risks in extending credit to a Chapter 13 debtor, the high pre-petition arrearage of $30,310.57, and the likelihood of depreciation in value since both appraisals noted a decline in the market area of homes." The court in *In re St. Cloud*, 209 B.R. 801 (Bankr. D. Mass. 1997), in a pre-*Till* decision that adopted a "prime-plus" approach, incrementally added percentage points to the base rate of interest, defined as the "average annual interest rate for 30-year fixed residential mortgages." The court explained:

> To the base rate, the Court shall add one percentage point because of the Debtors' history of defaults in payment of the mortgage. The Court will add one point because of the substantial prepetition mortgage arrears, which at the commencement of the Debtors' case was $25,000.00. Additionally, the Court shall add one percentage point because of the Debtors' proposed balloon payment, which may increase FNMA's risk of not collecting its allowed secured claim should the Debtors default in their plan payments. In light of the testimony that the collateral is likely to appreciate, and because the duration of the plan is less than the original loan maturity date of 2019, the Court makes no further upward adjustment of the base rate.

*Id.* at 808-09.

In the Debtors' case before me, the parties agreed that the current prime rate of interest is 3.25%. In their plan, the Debtors propose a risk adjustment of 1% to arrive at a 4.25% interest rate, while the Bank counters with a risk adjustment of 2% to arrive at a 5.25% interest rate. Rather than provide evidence during the valuation hearing, the Bank "relie[d] on the arguments presented in its Objection to the plan to justify an interest rate of at least 5.25%."[4] The Debtors relied on arguments advanced during the hearing to support their proposed interest rate of 4.25%.

During the hearing, Debtors' counsel acknowledged that one of the three units in the Residence is currently vacant. Consequently, insufficient income is currently being generated from the property to satisfy the amount of the monthly mortgage payment proposed under the

---

[4] *See* Doc. #41, Joint Pretrial Statement, IV.1.

13

Debtors' plan based on the now rejected valuation of $100,000 with a 4.25% interest rate. Debtors' counsel also acknowledged that the Debtors' cash flow is "tight" and may not enable the Debtors to fund a plan based on a higher value for the Residence than what the Debtors proposed. According to Debtors' counsel, the Debtors' children are presently willing and able, at least for the short term, to assist the Debtors in supplementing any cash flow shortage for the plan payments. Furthermore, the entire secured claim of the Bank will be paid to the Chapter 13 Trustee over the five-year plan term, providing a greater degree of payment continuity for the plan.

While the Debtors are not yet at the plan confirmation stage, feasibility of the plan is a factor noted by the *Till* Court in calculating the risk adjustment. The fact that one unit remains vacant and the Debtors' children have offered to make up the shortfall on the plan payments concerns me:

> As a general proposition, gratuitous payments to a debtor by his family members do not constitute regular income for Chapter 13 purposes, although exceptions exist, particularly where the contribution comes from a non-debtor spouse, or is made pursuant to some contractual or legal obligation, or where there is evidence of regular contributions having been made in the past.

*In re Porter*, 276 B.R. 32, 38 (Bankr. D. Mass. 2002).

The Debtors have provided no evidence suggesting that the Debtors' children have legally committed themselves to meeting any shortfall that arises in the plan payments over the five-year plan term. Without such a guarantee, the risk of default is more significant where a primary source of income to fund the plan is the rental income the Debtors receive from the Residence.

Considering the broad *Till* factors and the guidance provided by *In re St. Cloud* and *In re Plourde*, I find that an appropriate upward adjustment of the interest rate from the prime rate is 1.75% to account for the feasibility of the plan, which is to some degree contingent on the

14

willingness and ability of the Debtors' children to supplement the Debtors' income in the event of a cash shortfall. I make no further upward adjustments to the interest rate in light of the Debtors' commitment to pay the Bank's entire secured loan (the amount of which I have now determined) through the plan.

   3.  **Court's Ruling**

Based on the above findings and conclusions, the Bank's Objection to Confirmation of the Debtors' Chapter 13 Plan is SUSTAINED on the grounds that the plan as proposed fails to pay the Bank the full amount of its secured claim of $146,000 and fails to provide for payment of interest on that secured claim at the rate of 5% during the term of the plan. The Debtors shall, within 14 days hereof, file an amended plan in accordance with the terms of this Decision and Order, or, alternatively, a motion to convert the case to a case under Chapter 7.

Dated: this 3rd day of April, 2013.

By the Court,

*Diane Finkle*

Diane Finkle
U.S. Bankruptcy Judge